## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.: 0:20-cv-61121

CODY THOMAS FITZPATRICK and
CODY JOHN CROCKETT, on behalf of
themselves and all others similarly situated,

     Plaintiffs,                               **CLASS ACTION**

v.                                            **JURY DEMAND**

VITAL PHARMACEUTICALS, INC.,
d/b/a VPX SPORTS,

     Defendant.
_____/

### CLASS ACTION COMPLAINT

1.     VPX manufactures, markets, and distributes, BANG energy drinks, a product that purportedly affords consumers with a wide swath of benefits–such as increased testosterone levels, prophylaxis from "all forms of dementia," but most explicitly, the pharmacological benefits of creatine–of which VPX contributes to BANG's seminal ingredient: SUPER CREATINE.



2.      The "SUPER CREATINE" contained in *all* BANG energy drinks, the "SUPER CREATINE" predominantly emblazoned on the face of *all* BANG energy drinks, the "SUPER CREATINE" that VPX lists as the leading ingredient behind BANG's elevation from "*life-sucking soda masquerading as an energy drink*" to "*potent brain & body rocking fuel*," the "SUPER CREATINE" that VPX markets as the "brainchild" of Jack Owoc,[1] and most seriously, the "SUPER CREATINE" that VPX has deceived millions of consumers into believing *was* creatine: **IS <u>NOT</u> CREATINE**.



*Excerpt from the* "Lemon Drop" *BANG energy drink container depicted on the left*

3.      Contrary to VPX's aggressive marketing and portrayal of the product, BANG

---

[1] Jack Owoc, the self-accredited "*number one product formulator in the world in the dietary supplement industry*," is VPX's Chief Executive Officer (CEO) and Chief Science Officer (CSO).

energy drinks do not afford consumers with the miraculous benefits VPX touts, as what VPX deceptively portrays as "SUPER CREATINE" is **not** creatine, nor does it afford consumers with any of the documented, metabolic benefits of creatine.

4.     The compound that VPX advertises as "Super Creatine" is actually a covalently bonded creatine dipeptide, creatinyl-l-leucine,[2] and *not* a bioavailable form of creatine. VPX deceptively takes advantage of the fact that consumers, upon seeing or hearing the name "Super Creatine," are misled to believe that "Super Creatine" has the same function and benefit of creatine in the body, *i.e.*, that Super Creatine is a source of creatine.



*Excerpt of the ingredients listed on the "Lemon Drop" BANG energy drink shown to the left*

5.     By labeling Creatinyl-l-leucine (which is not creatine) as Super Creatine, and advertising the benefits of creatine, VPX fraudulently seeks to capitalize on the well-established

---

[2] The term "creatyl" listed on BANG energy drinks is incorrect terminology. The correct term is "creatinyl." For simplicity, however, the terms will be used interchangeably

market for creatine and the public's knowledge regarding the ergogenic benefits of creatine. As explained in greater detail below, Super Creatine is not creatine and, contrary to VPX's false statements, Super Creatine does not form creatine when ingested.

6.      And so, Plaintiffs, Cody Thomas Fitzpatrick and Cody John Crockett, individually and on behalf of all those similarly situated, sue Defendant Vital Pharmaceuticals, Inc., d/b/a VPX Sports ("VPX"), for violations of the Florida Deceptive and Unfair Trade Practices Act, Unjust Enrichment, Breach of Express Warranty, and Breach of Implied Warranty of Merchantability.

## PARTIES

7.      Plaintiff Cody Thomas Fitzpatrick is a natural person and at all relevant times a resident and citizen of Broward County, Florida.

8.      Plaintiff Cody John Crockett is a natural person and at all relevant times a resident and citizen of Broward County, Florida.

9.      Defendant VPX is a Florida profit corporation organized and existing under the laws of the state of Florida, and headquartered at 1600 North Park Drive, Weston, Florida 33326. As such, Defendant VPX is a citizen of Florida. Defendant VPX manufactures, advertises, markets, distributes, and/or sells BANG energy drinks, along with BANG MASTER BLASTER, the powered form of BANG energy drinks, to hundreds of thousands of consumers in Florida and throughout the United States. VPX may be served with process by serving its registered agent, Corporate Creations Network Inc., at 801 U.S. Highway 1, North Palm Beach, Florida 33408.

## JURISDICTION AND VENUE

10.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A) because this is an action for a sum exceeding $5,000,000.00, exclusive of interest and costs, and in which at least one class member is a citizen of a state different than VPX.

11.     This Court has personal jurisdiction over VPX because VPX is a Florida profit corporation organized and existing under the laws of the state of Florida, and is authorized to do business and is conducting business throughout the United States, including in Florida.

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because many of the acts and transactions giving rise to this action occurred in this District and VPX is authorized to conduct business in this District, has intentionally availed itself of the laws and markets within this District through the promotion, marketing, distribution and sale of the VPX products in this District, and is subject to personal jurisdiction in this District.

## FACTUAL ALLEGATIONS

13.     VPX sells dietary supplements to consumers over the internet, including consumers in Florida. VPX's products are also sold at brick-and-mortar stores across the United States, including in Florida.

14.     VPX's website identifies BANG energy drinks as one of the company's "best sellers." BANG energy drinks are sold at retail stores such as 7-Eleven, gas stations, and other specialty stores throughout the United States, including Florida. While BANG energy drinks are sold in aluminum cans, like soft drinks, VPX also sells BANG MASTER BLASTER, a powered dietary supplement.

15.     VPX has waged a nationwide advertising and marketing campaign that falsely promotes the health benefits of BANG. As an example of the miraculous, albeit *false*, benefits of consuming BANG, VPX has claimed BANG can increase testosterone, and that BANG helps with "all forms of dementia, including Alzheimer's, Parkinson's, Huntington's, and other forms of

dementia."[3] VPX's advertising and marketing makes clear, BANG separates itself from other products by touting the benefits of what it calls "Super Creatine."

16.     In VPX's advertisements, VPX has repeatedly touted Super Creatine as "world's most bioavailable creatine." Super Creatine, however, is not creatine.

17.     There is zero scientific evidence establishing the effectiveness of VPX's Super Creatine in humans, and nothing in the limited studies on rodents shows that Super Creatine is proven to do anything to increase performance in humans, or even mice.

18.     VPX claims that its Super Creatine is the most soluble form of creatine and, therefore, the most bioavailable creatine available. This statement is false for three reasons.

19.     First, Super Creatine is less soluble than both creatine hydrochloride and creatine monohydrate.

20.     Second, a compound is not more bioavailable merely because it more soluble, especially if the compound is already 100% dissolved in water. At the 40mg amounts of Super Creatine VPX uses in BANG, creatine monohydrate would be 100% dissolved both in water and in the stomach.

21.     Third, and most critically, Super Creatine is not creatine, much less the "most bioavailable" form of creatine.

22.     The chart(s), as identified below, published in VPX's advertising is purposefully misleading as it represents dissolution rate (in a highly acidic non-existent in the human body media) not solubility rate.

---

[3] *See* https://www.youtube.com/watch?v=_hYcTX9jYr0. Note, this video was a public video until approximately Spring 2019, at which point, instead of being removed or deleted, the video was relabeled as private and remains in existence online.

### SUPER CREATINE IS NOT CREATINE AND
### IT DOES NOT BECOME CREATINE WHEN CONSUMED

23.     There are several popular forms of creatine for use in dietary supplements, some of the most popular are: (1) creatine monohydrate, (2) creatine hydrochloride, and (3) creatine nitrate.

24.     While each of the commonly sold forms of creatine are unique, each is a source of creatine that can be utilized by the body to produce creatine phosphate when consumed. Creatine phosphate plays a critical role in cellular energy production and it is involved in the formation of adenosine triphosphate, which is a source of cellular energy.

25.     Super Creatine is advertised as the marquee ingredient in BANG. The phrase Super Creatine is emblazoned at the top of every single BANG energy drink VPX sells. In fact, BANG energy drinks explicit invite consumers to "Power up with BANG's potent brain & body-rocking fuel," and identifies "Creatine" as the leading component.

26.     Make no mistake, despite the plainly deceptive and misleading name, SUPER CREATINE *is not* creatine, and BANG energy drinks *do not* contain creatine.

27.     VPX falsely claims on its website and in its advertising that Super Creatine "is the world's only water-stable creatine." This is false.

28.     On its website, VPX also claims that Super Creatine is somehow more effective than creatine monohydrate. VPX further represents that Super Creatine is "much more bioavailable than regular creatine." VPX also claims that Super Creatine can "beef up your muscles and your brain." All of these claims are false.

29.     Touting the benefits of its Super Creatine, VPX's website includes a video titled, "How Does Creatine Work?" In that video, VPX's owner, Jack Owoc states:

> The future of creatine . . . is going to be more about the brain than the body. As you age, you have creatine transport deficiency syndrome where creatine does not cross the bloodbrain barrier as

well as it does when you are younger. Because of this, as you age, you become mentally retarded . . . every day that goes by, you are becoming more and more mentally retarded . . . now we have great news though, we can possibly reverse that with these new creatine peptides that I've patented. They're miraculous because peptides can cross the blood-brain barrier better than creatine alone. In fact, creatine alone is very poor at crossing the blood-brain barrier . . . If you have a creatine peptide . . . you can solve creatine transport deficiency syndrome, you can solve mental retardation as we age ... Bang Energy drinks, yes, it says Super Creatine across the top. Super Creatine does refer to the patent creatine amino acid peptide and it is in Super Creatine. That's why we call Bang, 'Potent Brain and Body Fuel.' So it's in the drink, the Bang drink, the. Bang beverage, which is coming out in a caffeine-free version very soon.[4]

30.   VPX, through Owoc, goes on to claim that research shows that creatine peptides like Super Creatine can cross the blood brain barrier "twenty times more efficiently than regular creatine," and also helps with "all forms of dementia, including Alzheimer's, Parkinson's, Huntington's, and other forms of dementia." As a result, Owoc encourages viewers to consume BANG energy drinks to get Super Creatine.

31.   By labeling Creatinyl-l-leucine (which is not creatine) as Super Creatine, and advertising the benefits of creatine, VPX fraudulently seeks to capitalize on the well-established market for creatine and the public's knowledge regarding the ergogenic benefits of creatine.

32.   As explained below, Super Creatine is NOT creatine and, contrary to VPX's false statements, Super Creatine does not form creatine when ingested.

33.   The compound that VPX advertises as Super Creatine is actually a covalently bonded creatine dipeptide, not a bioavailable form of creatine. VPX deceptively takes advantage of the fact that consumers, upon seeing or hearing the name Super Creatine, are led to believe that

---

[4] *See* https://www.youtube.com/watch?v=_hYcTX9jYr0. Note, this video was a public video until approximately Spring 2019, at which point, instead of being removed or deleted, the video was relabeled as private and remains in existence online.

Super Creatine has the same function and benefit of creatine in the body, *i.e.*, that Super Creatine is a source of creatine.

34.     The Super Creatine dipeptide (creatinyl-l-leucine or creatinyl-l-glutamine) is **not** creatine. In advertising regarding Super Creatine, VPX describes the creatinyl-l-luecine dipeptide as "di-peptides [that] can be hydrolyzed to release creatine and amino acids in the body once they have been consumed." VPX further explains, "Chemically, these creatine di-peptides have an amide bond, which is very stable in normal conditions. However, when these di-peptides are ingested, the gastric fluids in the stomach (which are highly acidic with pH levels between 1.5 to 3.5) can break down the amide bond, and then the free creatine and amino acid are released."

35.     In laymen's terms, VPX claims that when Creatinyl-l-leucine dipeptide is consumed, stomach acid will break the bond between the creatine and l-leucine, thereby releasing creatine (and leucine) into the stomach which is then absorbed by the body just like regular creatine (and amino acid) would be. But this is not what happens when consumers ingest Creatinyl-l-leucine dipeptide.

36.     The data included in VPX's own patent and the results of a study that VPX recently commissioned on creatinyl-l-leucine in rodents proves that VPX knows this, and that VPX is blatantly and intentionally lying to consumers.

37.     Paragraph 25 of VPX's own patent includes testing data which shows that the Super Creatine dipeptides such as creatinyl-l-glutamine and creatinyl-l-leucine are stable and do not breakdown in pH of 3.3.

The above described formulations were stored in glass vials at room temperature (25° C., 77° F.), at refrigerator temperature (4° C., 39° F.) and at elevated temperature (40° C., 104° F.) in vials. These samples were assayed by HPLC at periodic intervals for minimum of 60 days for creatyl-L-glutamine (C-L-G) and creatinine (degradation product of creatine) content. The % recovery results are presented below.

| | Ready To Drink Formulation (pH = 3.3) | | | | | |
| | Room Temperature | | 4° C. (39° F.) | | 40° C. (104° F.) | |
| | C-L-G | Creati-nine | C-L-G | Creati-nine | C-L-G | Creati-nine |
|---|---|---|---|---|---|---|
| Initial | 98.81 | 1.19 | N/A | N/A | N/A | N/A |
| 1 Day | 99.16 | 0.84 | 99.23 | 0.77 | 98.92 | 1.08 |
| 3 Days | 98.76 | 1.24 | 98.96 | 1.04 | 97.96 | 2.04 |
| 1 Week | 98.91 | 1.09 | 99.28 | 0.72 | 97.05 | 2.95 |
| 2 Weeks | 98.59 | 1.41 | 99.27 | 0.73 | 95.45 | 4.55 |
| 3 Weeks | 98.33 | 1.67 | 99.16 | 0.84 | 94.49 | 5.51 |
| 4 Weeks | 97.95 | 2.05 | 98.98 | 1.02 | 93.25 | 6.75 |

38.     In the chart below ¶ 26 of VPX's patent, under "neutral formulation" which covers a pH range of 7.0-8.0, creatinyl-lglutamine also breaks down into creatinine (not creatine) at this pH range (this range covers the pH found in plasma, brain, and cerebrospinal fluid).

| | Ready To Drink Formulation (pH = 3.3) | | | | | |
| | Room Temperature | | 4° C. (39° F.) | | 40° C. (104° F.) | |
| | C-L-G | Creati-nine | C-L-G | Creati-nine | C-L-G | Creati-nine |
|---|---|---|---|---|---|---|
| 6 Weeks | 97.41 | 2.59 | 98.22 | 1.78 | 89.12 | 10.88 |
| 2 Months | 97.45 | 2.55 | 98.88 | 1.12 | 87.46 | 11.50 |
| 3 Months | 94.32 | 5.68 | 94.67 | 5.33 | 89.83 | 10.17 |

| | Neutral Formulation (pH = 7.0-8.0) | | | | | |
| | Room Temperature | | 4° C. (39° F.) | | 40° C. (104° F.) | |
| | C-L-G | Creati-nine | C-L-G | Creati-nine | C-L-G | Creati-nine |
|---|---|---|---|---|---|---|
| Initial | 99.15 | 0.85 | N/A | N/A | N/A | N/A |
| 1 Day | 99.15 | 0.85 | 99.20 | 0.80 | 98.77 | 1.23 |
| 3 Days | 98.41 | 1.59 | 99.11 | 0.89 | 89.95 | 10.05 |
| 1 Week | 93.53 | 6.47 | 99.09 | 0.91 | 91.03 | 8.97 |
| 2 Weeks | 74.62 | 25.38 | 99.03 | 0.97 | 27.12 | 72.88 |
| 3 Weeks | 52.89 | 47.11 | 98.95 | 1.05 | 36.96 | 63.04 |
| 4 Weeks | 39.47 | 60.53 | 99.00 | 1.00 | 16.15 | 83.85 |
| 6 Weeks | 5.47 | 94.53 | 97.29 | 2.71 | 0.00 | 100.00 |
| 2 Months | 0.00 | 100.00 | 97.90 | 2.10 | 0.00 | 100.00 |
| 3 Months | 0.00 | 100.00 | 97.77 | 2.23 | 0.00 | 100.0 |

39.     Accordingly, it is reasonable to conclude that even if after the dipeptides are absorbed (mostly intact) by the G.I. tract, whatever small portion of them breaks down will be broken into the parent amino-acid and creatinine, NOT creatine. Such conversion of course would be minimal at best as both VPX's testing and that performed by Dr. Burov show the compounds would be more than 99% stable in the few hours they would spend in the body after ingestion.

40.     Furthermore, simple testing data has shown that pH 3.3 is within the pH range of the BANG energy drink. In other words, Super Creatine (creatinyl-l-glutamine and/or creatinyl-l-leucine) will remain stable, and not break down inside a can of BANG because the pH of 3.3 inside the can maintains a stable environment for the so-called Super Creatine compound.

41.     Also, a pH of 3.3 (the same pH that VPX says Super Creatine is stable at) is consistent with the typical pH of the human stomach, which averages about 1.5 to 3.5 pH, (a fact admitted by VPX in VPX's advertising).

42.     Therefore, the Super Creatine dipeptides such as creatinyl-l-leucine and creatinyl-l-glutamine are stable and will not break down in the stomach (or in response to stomach acids).

43.     Because Super Creatine is stable and will not break down in stomach acid, Super Creatine will not break down into its parent compounds (creatine and leucine) when ingested. Simply put, Super Creatine does NOT break down to creatine when ingested.

44.     Yet contrary to these facts, which are well known to VPX, VPX has repeatedly and intentionally lied to consumers claiming that the Super Creatine dipeptides, such as creatinyl-l-leucine and creatinyl-l-glutamine break down into their parent compounds (creatine and leucine, or creatine and glutamine) and provide the benefits of creatine and the parent amino acid (leucine or glutamine) to consumers who are tricked into purchasing BANG drinks.

45.     To sum up, VPX has knowingly falsely advertised its BANG products by claiming that creatinyl-l-leucine and creatinyl-l-glutamine are highly bioavailable sources of creatine that will provide the benefits of creatine. This is untrue. As all data suggests, the compounds either remain un-metabolized as a dipeptide that cannot be utilized as (or perform the function of) creatine in the body, or, as VPX's own testing shows, Super Creatine will break down into creatinine NOT creatine.

46.     Simply because a molecule contains a nutrient such as an amino acid in its chemical formula does not mean that the molecule is a source of said nutrient—unless the molecule can be metabolized to the nutrient. The following analogy is helpful, using VPX's logic one would assume that N-(phosphonomethyl) glycine, commonly known as glyphosate (which is the active compound in the herbicide Roundup) is a source of glycine. This is of course untrue, just like saying creatinyl-l-leucine (Super Creatine) is a source of creatine is also untrue.

47.     An example of VPX's willfully false advertising, in the Natural Muscle Magazine, dated May 2013, VPX advertised its Super Creatine as follows: "However when these di-peptides are ingested the gastric fluids in the stomach (which are highly acidic with ph levels between 1.5 and 3.5) can break down the amide bonds and then the free creatine and amino acid are released."



48.     As described above, VPX knows stomach acids will not break down Super Creatine dipeptides in the same pH as found in the stomach, yet they continue to blatantly lie to consumers and say the opposite of what they know to be true.

49.     The same lies about the purported breakdown of the Super Creatine dipeptides into their parent compounds (which falsely indicates that Super Creatine is actually a source of creatine) can be seen in many other marketing materials, including VPX's own website.[5]

Recently, The United States Patent and Trademark Office (USPTO) granted VPX United States Patent number 8,445,466 for Bio-Active Aqueous Stable Creatine Species, more commonly known as mTORC1™. In this invention, creatine is linked to an amino acid or peptide forming a powerful covalent bond. These creatine di-peptides can be hydrolyzed to release creatine and amino acids in the body once they have been consumed. Chemically, these creatine di-peptides have an amide bond, which is very stable in normal conditions. However, when these di-peptides are ingested, the gastric fluids in the stomach (which are highly acidic with pH levels between 1.5 to 3.5) can break down the amide bond, and then the free creatine and amino acid are released.

50.     In addition to the stability evidence presented above which was performed on the Super Creatine dipeptide, Creatinyl-l-glutamine (the original compound in the BANG drinks), VPX has recently admitted that they have known the same to be true for the Super Creatine dipeptide, Creatinyl-l-leucine (the compound currently in BANG drinks).

51.     In a desperate attempt to overcome the Patent Office's rejection and cancelation of all Jack Owoc's patent claims to Super Creatine dipeptides, Owoc and VPX have publicly disclosed stability testing that they did on Creatinyl-l-leucine.

52.     The chart produced by VPX clearly shows that the Super Creatine dipeptide, creatinyl-lleucine is stable at a pH of 3.1 (a pH environment well within the range of an average

---

[5]  https://web.archive.org/web/20140625084330/http://vpxsports.com/muscle-building-supplements/cremtor (last visited on May 27, 2020).

human stomach), thus contrary to VPX's lies, Super Creatine dipeptides will remain stable in the stomach and not break down to a source of creatine.

| Assay Stability Data for Creatyl-l-Leucine (C-L-L) | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Results by Area Normalization in % | | | | | | | | | | | | | | | | | | | | | | | |
| | Stability | | | | | | | | | | | | | | | | | | | | | | | |
| Sample Description | 0 Day | | 1 Day | | 2 Day | | 3 Day | | 1 Week | | 2 Week | | 3 Week | | 1 Month | | 2 Month | | 3 Month | | 4 Month | | 6 Month | |
| | C-L-L | Creatinine | C-L-L | Creatinine | C-L-L | Creatinine | C-L-L | Creatinine | C-L-L | Creatinine | C-L-L | Creatinine | C-L-L | Creatinine | C-L-L | Creatinine | C-L-L | Creatinine | C-L-L | Creatinine | C-L-L | Creatinine | C-L-L | Creatinine |
| Neutral C-L-L pH<6.0  25°C R1 | 98.81 | 1.19 | 99.63 | 0.31 | 99.59 | 0.41 | 99.42 | 0.58 | 99.32 | 0.68 | 98.84 | 1.16 | 98.40 | 1.60 | 97.70 | 2.30 | 95.86 | 4.14 | 93.68 | 6.32 | 91.40 | 8.60 | 84.36 | 15.64 |
| Neutral C-L-L pH<6.0  4°C R1 | N/A | N/A | 99.83 | 0.17 | 99.71 | 0.29 | 99.63 | 0.37 | 99.56 | 0.45 | 99.63 | 0.37 | 99.64 | 0.36 | 99.59 | 0.41 | 99.65 | 0.35 | 99.73 | 0.27 | 99.71 | 0.29 | 99.48 | 0.52 |
| Neutral C-L-L pH<6.0  40°C R1 | N/A | N/A | 99.31 | 0.69 | 92.49 | 1.51 | 95.10 | 4.90 | 90.41 | 9.59 | 84.20 | 15.80 | 79.84 | 20.16 | 61.34 | 32.66 | 42.63 | 57.37 | 31.55 | 68.45 | 11.88 | 88.12 | | |
| Acidic C-L-L pH<3.1  25°C R1 | 99.15 | 0.85 | 99.89 | 0.11 | 99.90 | 0.10 | 99.68 | 0.12 | 99.79 | 0.21 | 99.64 | 0.36 | 99.48 | 0.52 | 99.34 | 0.66 | 98.75 | 1.21 | 98.14 | 1.85 | 97.65 | 2.35 | 96.14 | 3.86 |
| Acidic C-L-L pH<3.1  4°C R1 | N/A | N/A | 100.00 | 0.00 | 100.00 | 0.00 | 99.94 | 0.06 | 99.93 | 0.07 | 99.92 | 0.08 | 99.92 | 0.08 | 99.91 | 0.09 | 99.85 | 0.15 | 99.87 | 0.13 | 99.83 | 0.17 | | |
| Acidic C-L-L pH<3.1  40°C R1 | N/A | N/A | 99.77 | 0.23 | 99.60 | 0.40 | 99.40 | 0.60 | 98.69 | 1.31 | 97.43 | 2.57 | 95.73 | 4.37 | 94.56 | 5.44 | 89.18 | 10.82 | 82.79 | 17.21 | 77.71 | 22.29 | 66.07 | 33.93 |
| Bang C-L-L pH<3.1  25°C R1 | 99.23 | 0.77 | 99.90 | 0.10 | 99.90 | 0.10 | 99.85 | 0.15 | 99.80 | 0.20 | 99.60 | 0.40 | 99.47 | 0.53 | 99.30 | 0.70 | 98.71 | 1.29 | 97.94 | 2.06 | 97.81 | 2.19 | 97.04 | 2.96 |
| Bang C-L-L pH<3.1  4°C R1 | N/A | N/A | 99.93 | 0.07 | 100.00 | 0.00 | 99.92 | 0.08 | 99.94 | 0.06 | 99.91 | 0.09 | 99.90 | 0.10 | 99.88 | 0.12 | 99.84 | 0.16 | 99.93 | 0.07 | 99.88 | 0.12 | 99.92 | 0.08 |
| Bang C-L-L pH<3.1  40°C R1 | N/A | N/A | 99.75 | 0.25 | 99.59 | 0.41 | 99.39 | 0.61 | 98.68 | 1.32 | 97.35 | 2.65 | 95.89 | 4.11 | 54.50 | 5.70 | 63.18 | 10.82 | 82.48 | 17.52 | 77.50 | 22.50 | 55.46 | 34.54 |

| Temperature | |
|---|---|
| Celsius | Fahrenheit |
| 25°C | 77.0°F |
| 4.0°C | 39.2°F |
| 40.0°C | 104.0°F |

53.     Adding to the proof that VPX knows its advertising statements are false and that VPX is intentionally lying to consumers, VPX has repeatedly claimed during the reexamination proceedings at the USPTO that the Super Creatine dipeptides in question (creatinyl-leucine and creatinyl-l-glutamine) become more stable at a lower pH, as would typically be found in the stomachs of consumers who purchase and consume BANG expecting the benefits of creatine.

54.     Furthermore, in addition to the stability testing discussed above, which was done in vitro (i.e. in a test tube), VPX also recently made public toxicology testing done on Super Creatine in rodents.

55.     Because Super Creatine is a synthetic compound that has not been consumed by humans previously, in order to use Super Creatine in a Dietary Supplement or in food VPX needed to establish that this ingredient was safe for human consumption.

56.     To do this VPX paid for a toxicological assessment in mice to try and establish safety data for Super Creatine: "A toxicological assessment of creatyl-lleucine" Reddeman et al. 2018 ("Reddeman Study").

57.     The Reddeman Study notes that the authors of the toxicology assessment obtained data directly from VPX's President Owoc. The authors refer to this data as: "An unpublished simulated gastric digestion study on creatyl-L-glutamine [which] indicated that only 27% of the compound was hydrolyzed;" The "unpublished data" is cited as: "Owoc J, Li L. Effect of pepsin on creatyl L-glutamine (CLG). 2014. 4. Unpublished data."

58.     Accordingly, by VPX's own admission, it has possessed simulated gastric digestion data for Super Creatine since 2014. Directly contrary to VPX's advertising claims about Super Creatine breaking down to its parent compounds in the stomach, VPX's own data shows that the Super Creatine dipeptide, creatinyl-l-glutamine, breaks down very poorly during digestion. The information disclosed by the authors of the study is directly the opposite of what Jack Owoc and VPX advertise to consumers. No wonder VPX kept this data secret.

59.     Shockingly, the results of the Reddman Study are even more damning to VPX than VPX's own previously undisclosed stability testing and its unpublished digestion data. The Reddman Study confirms that when Super Creatine does break down, it breaks down into creatinine NOT creatine.

60.     As the Reddeman Study notes, in rodents fed creatinyl-l-leucine: "Creatinine was statistically significantly increased compared to controls in the mid- and high-dose groups, and in the female high-dose group, the related parameter, urea, was statistically significantly increased without a clear dose relationship." The Reddeman Study also explains, "[i]t is unknown whether CLL [creatinyl-l-leucine] is digested to creatine in the digestive tract or absorbed and metabolized to creatine in vivo, and if so, to what extent."

61.     Accordingly, scientists commissioned by VPX found that administering creatinine-l-leucine in mice increases creatinine, NOT creatine. The scientists specifically noted that it is

currently unknown whether creatinyl-l-leucine converts to creatine in mice, and there is zero data on the effect in the human body, despite VPX's many false marketing claims that assure consumers the opposite.

62.     This is not surprising since all of the stability data produced by VPX so far shows that when Super Creatine does break down the result is creatinine, NOT creatine. As shown in the data below, taken directly from VPX's patent, VPX knows that when Super Creatine does break down it breaks down to creatinine, NOT creatine:



63.     Unlike creatine, creatinine does not increase athletic performance. In fact, VPX's own website describes creatinine as "a useless substance … which taxes the kidneys and has none of the benefits of creatine."[6]

THE TAKE HOME MESSAGE:
In most drugs and nutrients, increasing solubility is usually desired because it means the compound will be more effective. However, as we have witnessed in VPX laboratories with CEE (Creatine Ethyl Ester) and Cr-HCl (Creatine Hydrochloride), improving creatine's solubility meant that these forms of creatine rapidly convert to a useless substance called creatinine, which taxes the kidneys and has none of the benefits of creatine. Till exempel: Even though CM (Creatine Monohydrate) is far

---

[6]  https://sv.luckyvitamin.com/p-649683-vpx-cremtor-creatyl-l-leucine-peptidewatermelon-8-04-oz (last visited on May 27, 2020).

64.     The named inventor on the RU '645 Patent is Sergey Burov. Dr. Burov discussed creatinyl-l-leucine at length in his paper, titled: "Creatinyl amino acids—new hybrid compounds with neuroprotective activity." Dr. Burov's paper states that when the dipeptide bond is severed, the resulting compound is creatinine, NOT creatine.

65.     In fact, Dr. Burov's paper even includes a diagram showing the suggested mechanism how the compound degrades to creatinine, NOT creatine:



66.     VPX is very well familiar Dr. Burov's work and this article. In fact, in a prior advertisement Owoc and VPX plagiarized Dr. Burov's work, lifting wholesale sections of this work without attribution.

67.     In sum, VPX's Super Creatine is NOT creatine. It is creatinyl-l-leucine or creatinyl-l-glutamine that when ingested does not break down into creatine as the resulting compound when it breaks down is creatinine, NOT creatine. As VPX's own advertising admits, creatinine is "a useless substance" that is potentially harmful. By labeling Super Creatine as a creatine and touting the benefits of creatine when advertising its BANG products, VPX has willfully and intentionally misled consumers into believing that BANG provides the health and ergogenic benefits of creatine, when it does not.

### THERE IS NO SCIENTIFIC EVIDENCE TO SUPPORT
### VPX'S GRANDIOSE CLAIM REGARDING THE BENEFITS OF BANG.

68.     VPX has advertised that creatine-peptides like Super Creatine can cross the blood brain barrier "twenty times more efficiently than regular creatine," and this helps with "all forms of dementia, including Alzheimer's, Parkinson's, Huntington's, and other forms of dementia."

69.     VPX has also claimed that its Super Creatine can stop "mental retardation."

70.     On information and belief, BANG contains less than 40 milligrams of the purported "Super Creatine."

71.     With respect to *actual* creatine, 40 milligrams is approximately 100 times less than the minimum effective dose of creatine necessary to have any potential effect. For this reason alone, even if Super Creatine was a source of creatine (which it is not), VPX's marketing on the benefits of Super Creatine would all be completely false and misleading. It is not scientifically possible that the 40 milligram dose of Super Creatine included in the BANG energy drinks will aid in athletic performance in the way properly dosed creatine does, much less that the Super Creatine will have the fantastical medicinal effects touted by VPX in its advertising.

72.     Moreover, there is simply no testing on the effects of VPX's Super Creatine dipeptides in humans. The clinical testing that VPX relies on to support its fantastical claims are all clinical tests conducted on the world's most popular ergogenic Dietary Supplement Ingredient: creatine. As explained above, Super Creatine is not actually creatine and it does not break down into creatine when consumed. For this reason, none of VPX's advertising claims are supportable.

73.     The effects of Super Creatine in humans are currently unknown. The only existing study regarding the neuroprotective efficiency of Super Creatine (which was on mice and rats) is discussed above. This study was conducted by the inventor of Super Creatine, Dr. Burov. Dr. Burov found Super Creatine dipeptides to be effective at 100- 500mg/kg dose in rodents (mice and

rats). In humans, to create the same dose that produced this effect, VPX would need to include tens to hundreds of times more than the 40mg of Super Creatine allegedly included in BANG energy drink.

74.     Plus, many compounds that are effective in animal testing do not have the same effect in humans. To date there is no clinical data to prove any effect of Super Creatine in humans; accordingly, any claims by Jack Owoc and/or VPX as to the effect of Super Creatine in humans are lies made up by Owoc and/or VPX to trick consumers who seek to obtain the benefits of creatine and amino acids.

75.     In sum, VPX's Super Creatine is NOT creatine. Accordingly, none of the clinical testing on creatine that VPX relies on to support is fantastical advertising claims is actually relevant. There is simply no study showing that Super Creatine administered alone has any effect on humans, much less that it has the potential to cure some of the world's most serious diseases. Moreover, even if Super Creatine has some medicinal effects, BANG is severely under-dosed. For this reason, as well, VPX's intentionally false comparative advertising unquestionably misleads consumers; for this reason, VPX's ill-gotten gains, earned on lies, must be disgorged.

### SUPER CREATINE IS NOT A MORE SOLUBLE FORM OF CREATINE

76.     VPX's has also falsely claimed that Super Creatine is more soluble than other forms of creatine.

77.     In an advertorial that appears on muscleandfitness.com, VPX stated the following: "Special Note: Creatine and leucine have horrible solubility. What's super cool is that the patented Creatyl-L-Leucine Super Creatine peptide is one of the most soluble of all creatines and it dissolves in just seconds when you stir it into water and even faster in stomach acid!"



**JACK OWOC INVENTS WORLD'S MOST BIOAVAILABLE  CREATINE**

Highly Important Scientific Innovations of the 21st Century
N-Acetyl Super Creatine Molecules Science

## Solubility Data for Various Types of Creatine in HCl

| Dissolution Media (pH = 1.2) | 0.1N HCl in Water |
|---|---|
| Media Amount | 900ml |
| Dissolution Temperature | 37°C |
| RPM | 75 |
| Sample Weight | 1.000 Gram |

| Sample Description | Time (Minute) |
|---|---|
| N-Acetyl Creatine – VPX's New Super Creatine™ | 2.17 |
| Creatine HCl | 3.02 |
| Creatyl-L-Leucine – VPX Patented Water Stable Super Creatine™ Peptide | 3.86 |
| Creatine Gluconate | 4.13 |
| Creatine Citrate | 5.32 |
| Di Creatine Malate | 5.35 |
| Creatine Nitrate | 5.77 |
| Creatyl-L-Glutamine – VPX Patented Water Stable Super Creatine™ Peptide | 6.33 |
| Creatine Monohydrate | 9.83 |
| Creatine Taurinate | 10.30 |

Figure 1, above, shows the solubility of various creatine species compared to N-Acetyl Super Creatine in Hydrochloride (HCl) at 37 °C. The information shows that one gram of N-Acetyl Super Creatine dissolves faster and is currently more bioavailable than any other creatine species. Also take special note of the extreme solubility Creatyl-L-Leucine and keep in mind that this Super Creatine Peptide has the potential to simultaneously increase mTOR while suppressing myostatin to efficiently pack on lean muscle fast.

78.     Another example of VPX's false advertising, VPX tries to confuse the public by claiming dissolution rate (i.e., the time solid a compound takes to be completely dissolved in a solution, measured in time units, such as seconds) is the same as solubility (i.e., the maximum amount of a compound that can be dissolved in a solution, of which is measured in mg/l).

79.     Again, VPX makes false marketing claims trying to mislead its customers. VPX's "dissolves faster" claim does not equate to the fact that the compounds are more water soluble, merely that they dissolve faster in an acidic medium of pH 1.2. It is well known that acidic salts, like creatine nitrate, dissolve slower in acidic mediums. VPX falsely misrepresents the dissolution data to mean that its "new Super Creatines" will be more soluble and therefore more bioavailable with no data to support it.

80.     VPX has knowingly misbranded BANG products by claiming that creatinyl-l-leucine and creatinyl-l-glutamine are highly bioavailable sources of creatine that will provide the benefits of creatine. This is untrue.

81.     As all data suggests, the Super Creatine compounds either remain un-metabolized as a dipeptide that cannot be utilized as or perform the function of creatine in the body, or as VPX's own testing shows, Super Creatine will break down into creatinine not creatine.

82.     VPX has intentionally and willfully misled consumers to purchase BANG. For this reason, as well, VPX's intentionally false comparative advertising unquestionably misleads consumers; for this reason, VPX's ill-gotten gains must be disgorged.

### *SUPER CREATINE IS NOT A NATURAL INGREDIENT.*

83.     In addition to the false advertising statements identified above, VPX also falsely claims that BANG "contains no artificial ingredients."

84.     Consumers of Dietary Supplements value natural ingredients. There is a widely held belief that natural ingredients are better for you than artificial ingredients and that natural ingredients are safer.

85.     Directly contrary to VPX's claim, its Super Creatine, creatinyl-l-leucine, is not natural: this is a synthetic ingredient made in a lab.

86.     To be clear, creatinyl-l-leucine is not found anywhere in nature. The compound did not exist until it was invented by Dr. Burov.

87.     In addition to synthetic Super Creatine, BANG also contains sucralose (an artificial sweetener) and several artificial flavors.

88.     Nonetheless, VPX willfully and intentionally falsely advertises that its BANG product "contains no artificial ingredients."

89.     VPX has knowingly falsely advertised creatinyl-l-leucine and creatinyl-l-glutamine as natural (not containing artificial ingredients). This is not true. VPX has intentionally and willfully misled consumers to purchase BANG. For this reason, as well as VPX's intentionally false advertising, unquestionably misleads consumers, VPX's ill-gotten gains, earned on lies, must be disgorged.

## ALLEGATIONS SPECIFIC TO CODY THOMAS FITZPATRICK

90.     Mr. Fitzpatrick has long been a fitness enthusiast. While in college, Mr. Fitzpatrick maintained a strict diet wherein he regulated the amount of protein and creatine he ingested. Representatives for VPX showed up on the campus of the university of Florida and handed out free samples of Bang. VPX then began a heavy marketing campaign at UF and other universities.

91.     Mr. Fitzpatrick was intrigued by the claims made by the Bang representatives and began regularly drinking Bang in lieu of the powdered creatine he was taking. Mr. Fitzpatrick's favorite Bang flavors are Purple Haze, Blue Razz, and Cherry Blade Lemonade.

92.     Mr. Fitzpatrick switched to Bang over Monster Energy Drink and Red Bull due to Bang's creatine claims.

93.     If Mr. Fitzpatrick had known that Bang's claims were false—he would not have continued purchasing the product.

## ALLEGATIONS SPECIFIC TO CODY JOHN CROCKETT

94.     In Spring of 2017, Mr. Crockett began working at "That's-A-Wrap," a restaurant with two locations in Fort Lauderdale, Florida.

95.     Although "That's-A-Wrap" primarily sells fresh, made-to-order sandwiches and salads, it also sells bottled and/or canned drinks, of which includes "Monster" energy drinks, "Red Bull" energy drinks, and beginning in the Spring of 2018, BANG energy drinks.

96.     As an employee of "That's-A-Wrap," Mr. Crockett receives a discount on the food and drinks sold at the restaurant, of which included canned energy drinks. When "That's-A-Wrap" began carrying the BANG energy drink line in 2018, Mr. Crockett compared a container of BANG to the containers of "Monster" and "Red Bull."  Mr. Crockett observed that BANG stood out from both the Monster and Red Bull, as neither of these drinks contained creatine, whereas BANG – in bold lettering around the top of the can, as well as in the description of the drink listed on the can – claimed to contain "Super Creatine." Based on this comparison, as well as Mr. Crockett's familiarity with the benefits associated with *creatine*, Mr. Crockett concluded that the BANG line of energy drinks were superior to that of "Red Bull" or "Monster" because *only* BANG contained *super* creatine. Thereafter, as often as three times a day, Mr. Crockett would purchase a BANG energy drink instead of – what he had typically purchased up to that point – Monster or Red Bull.

97.     In simplest terms, because he believed BANG energy drinks to contain creatine, Mr. Crockett purchased BANG *instead* of Monster or Red Bull on a near daily basis. Although Mr. Crockett did not exclusively choose BANG over other energy drinks, it was the creatine claims plastered on the container of each and every can of BANG which caused Mr. Crockett to predominantly choose BANG energy drinks over all others. Had Mr. Crockett known that BANG *did not* contain creatine, Mr. Crockett would not have purchased BANG over his other options.

## CLASS ALLEGATIONS

98.     As detailed below in the individual counts, Plaintiffs bring this lawsuit on behalf of themselves and all others similarly situated, pursuant to Rule 23(a), (b)(2) and (b)(3), and (c)(4) of the Federal Rules of Civil Procedure.

### CLASS DEFINITIONS

99.      Plaintiffs seek to represent the following

Nationwide Class: All persons in the United States who purchased Bang within four years preceding the filing of this Complaint.

Or, in the alternative,

Florida Subclass: All persons in Florida who purchased Bang within four years preceding the filing of this Complaint.

100.　Together, the National Class and the Florida Subclass shall be collectively referred to herein as the "Class." Excluded from the above Classes are VPX and its officers, directors, affiliates, legal representatives, and employees, any governmental entities, any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff, and those who purchased BANG for resale

101.　Plaintiffs reserve the right to modify or amend the definition of the proposed Class before or after the Court determines whether such certification is appropriate as discovery progresses.

**NUMEROSITY**

102.　The Class is comprised of thousands of consumers throughout the United States and state of Florida. The Class is so numerous that joinder of all members of the Class is impracticable. While the precise number of class members is currently unknown to Plaintiffs, the evidence will show that VPX has sold, either directly or through third party retailers, well over 1,000,000 cans of BANG within the state of Florida alone.

103.　Moreover, it is administratively feasible to ascertain class members by reference to objective criteria: consumers who purchased BANG during specified time periods. There are no subjective issues such that determining class membership would require a "minitrial" on the merits of each class member's claim

104.    The evidence will show that VPX maintains records that will be useful in identifying Class Members. Further, VPX has a process for collecting consumer testimonials, through which they collect consumer's contact information for follow up, and therefore likely has contact information for consumers who have not purchased BANG directly through VPX.

105.    Moreover, the evidence will show that self-identification of class members will be a manageable process because every can of BANG was sold with the same ineffective and worthless apoaequorin and was packaged with identical, uniform misrepresentations on the labels. Class members will be able to self-identify through proof of purchase (such as receipts, credit card statements, or possession of the actual bottle(s) of BANG purchased) or through affidavit.

106.    Additionally, the evidence will show that third-party retailers who sell BANG possess significant information sufficient to identify purchasers of BANG, which can identify class members and be used to cross-reference and substantiate self-identifying affidavits to confirm class membership.

### COMMONALITY / PREDOMINANCE

107.    This action involves common questions of law and fact, which predominate over any questions affecting individual class members. These common legal and factual questions include, but are not limited to, the following: **[1]** whether the claims discussed above are true, or are misleading, or objectively reasonably likely to deceive; **[2]** whether the alleged conduct constitutes violations of the FDUTPA; **[3]** whether VPX engaged in false or misleading advertising; **[4]** whether VPX has been unjustly enriched at the expense of Plaintiffs and the Class members as a result of VPX's false and misleading representations; **[5]** whether Plaintiffs and Class members have sustained monetary loss and the proper measure of that loss; and **[6]** whether Plaintiffs and Class members are entitled to other appropriate remedies, including a declaration.

TYPICALITY

108.    Plaintiffs' claims are typical of the claims of the members of the Class because, *inter alia*, all Class members were injured through the uniform misconduct described above, were subject to VPX's deceptive statements, including that BANG helps with "all forms of dementia, including Alzheimer's, Parkinson's, Huntington's, and other forms of dementia," and can increase testosterone. Plaintiffs are advancing the same claims and legal theories on behalf of themselves and all Class Members.

109.    The evidence that will support and prove Plaintiffs' claims is probative of each Class Member, with damages being the only divergent factual characteristic. For example, VPX has admitted that Super Creatine will break down into *creatinine* **not** *creatine*. Further, as to damages, because proving Plaintiffs' claims will prove that BANG is rendered valueless as a result of the scientific fact that it does not contain creatine, then the purchase price is the appropriate measure of damages for Plaintiffs and every Class Member.

110.    Plaintiffs' claims are thus typical of the claims of the classes they seek to represent.

ADEQUACY OF REPRESENTATION

111.    Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the Class that they seek to represent; they have retained counsel competent and highly experienced in complex class action litigation and they intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiffs and their undersigned counsel.

REQUIREMENTS OF FED. R. CIV. P. 23(B)(3)

112.    The questions of law or fact common to Plaintiff's and each Class member's claims predominate over any questions of law or fact affecting only individual members of the Class. All

claims by Plaintiffs and the unnamed Class members are based on the common marketing and sales practices VPX utilized in its sale of BANG to Plaintiffs and the unnamed Class members.

113.     Common issues predominate when, as here, liability can be determined on a class wide basis, even when there will be some individualized damages determinations.

114.     As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the Class as is in the case at bar, common questions will be held to predominate over individual questions.

**SUPERIORITY**

115.     A class action is superior to individual actions in part because of following non-exhaustive factors: **[1]** Joinder of all Class members would create extreme hardship and inconvenience for the affected customers as they reside throughout the country**; [2]** Individual claims by Class members are impractical because the costs to pursue individual claims exceed the value of what any one Class member has at stake. As a result, individual Class members have no interest in prosecuting and controlling separate actions; **[3]** There are no known individual Class members who are interested in individually controlling the prosecution of separate actions; **[4]** The interests of justice will be well served by resolving the common disputes of potential Class members in one forum; **[5]** Individual suits would not be cost effective or economically maintainable as individual actions; and **[6]** The action is manageable as a class action.

**REQUIREMENTS OF FED. R. CIV. P. 23(B)(2)**

116.     VPX has acted and/or refused to act on grounds generally applicable to the classes by engaging in a uniform marketing and advertising campaign containing false, misleading and deceptive representations and material omissions that were and are reasonably likely to mislead

Plaintiffs and the Classes, thereby making appropriate final declaratory relief with respect to the classes as a whole.

117.   As it is clear that the predominant issue regarding VPX's liability is whether VPX's representations are false and/or misleading because, as a matter of body chemistry, BANG cannot help with "all forms of dementia, including Alzheimer's, Parkinson's, Huntington's, and other forms of dementia," nor can it increase testosterone or afford the consumer with creatine, utilizing Rule 23(c)(4) to certify either or both of the Florida Classes for a class wide adjudication on this issue would materially advance the disposition of the litigation as a whole.

## FRAUDULENT CONCEALMENT TOLLING

118.   All applicable statutes of limitation have been tolled by VPX's knowing and active fraudulent concealment and denial of the facts alleged herein throughout the period relevant to this action. Plaintiffs and members of the class did not and could not have known about the facts giving rise to the causes of action at any point during VPX's aggressive false advertising campaign and staunch defense of other pending suits. VPX fraudulently concealed the truth from its customers and, accordingly, the relevant statutes of limitation should be equitably tolled.

119.   Instead of disclosing the ineffectiveness and inability of BANG to provide the consumer with a meaningful supplemental source of creatine, VPX falsely represented that BANG contains creatine, that BANG helps with "all forms of dementia, including Alzheimer's, Parkinson's, Huntington's, and other forms of dementia," and that BANG can increase testosterone. By making many affirmative representations that concealed the ineffectiveness of BANG as described in this complaint, VPX actively and successfully concealed Plaintiffs' and class members' causes of action (which are based on the deceptive and untrue representations made by VPX about BANG).

120.     Furthermore, by making repeated false statements to consumers concerning the ineffectiveness of BANG, BANG actively and successfully concealed Plaintiffs' and class members' causes of action by fraudulent means.

## COUNT I
## FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT

121.     Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1–120 as if fully set forth herein.

122.     This cause of action is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act, section 501.201, Fla. Stat., et seq. ("FDUTPA"). The stated purpose of the FDUTPA is to "protect the consuming public . . . from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat.§ 501.202(2).

123.     Plaintiffs are consumers as defined by Fla. Stat. § 501.203. The BANG products are goods within the meaning of the FDUTPA. VPX is engaged in trade or commerce within the meaning of the FDUTPA.

124.     Section 501.204(1), Fla. Stat., declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." The FDUTPA also prohibits false and misleading advertising.

125.     VPX's unfair and deceptive practices as described herein are likely to mislead – and have misled – consumers acting reasonably in the circumstances.

126.     VPX has violated the FDUTPA by engaging in the unfair and deceptive practices as described herein which offend public policies and are immoral, unethical, unscrupulous and substantially injurious to consumers.

127.     Plaintiffs and consumers in the Florida Classes have been aggrieved by VPX's

unfair and deceptive practices and acts of false advertising, in that, they paid for BANG that did not and could not help with "all forms of dementia, including Alzheimer's, Parkinson's, Huntington's, and other forms of dementia," increase testosterone, or otherwise provide the consumer with a source of creatine, as represented.

128.     As a result, Plaintiffs and the Florida Classes have purchased worthless products such that their actual damages are the full purchase price of BANG.

129.     In addition, the practice employed by VPX, whereby VPX sold, promoted and marketed BANG with the deceptive representations herein described constitutes a *per se* violation of FDUTPA under § 501.203(3)(c) because it is in violation of the Florida Food Safety Act, § 500.04 (1) and (2), Fla. Stat., in that, said products are misbranded.

130.     VPX's false, unlawful, and misleading product descriptions render its products misbranded under Florida law. Specifically, § 500.04 of the Florida Food Safety Act prohibits the manufacture, sale or delivery of "misbranded food." VPX admits that BANG is a dietary supplement, which meets the definition of "food" under the FFSA. § 500.03(n)(5). Food is "misbranded" when "its labeling is false or misleading in any particular." Fla. Stat. § 500.11(1)(a) & (b). A food is considered mislabeled unless the proper disclosures are made "on the outside container or wrapper" on the product. § 500.03(1)(t). Misbranded products cannot be legally sold and are legally worthless.

131.     The harm suffered by Plaintiffs and consumers in the Florida Classes was directly and proximately caused by the deceptive, misleading and unfair practices of VPX, as more fully described herein.

132.     Pursuant to §§ 501.211(2) and 501.2105, Fla. Stat., Plaintiffs and consumers in the Florida Classes make claims for damages, attorneys' fees and costs.

## COUNT II
## <u>FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT</u>

133.   Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1–120 as if fully set forth herein.

134.   This cause of action is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act, section 501.201, Fla. Stat., et seq. ("FDUTPA"). The stated purpose of the FDUTPA is to "protect the consuming public . . . from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." Fla. Stat. § 501.202(2).

135.   Plaintiffs are consumers as defined by Fla. Stat. § 501.203. The BANG products are goods within the meaning of the FDUTPA. VPX is engaged in trade or commerce within the meaning of the FDUTPA.

136.   Section 501.204(1), Fla. Stat., declares unlawful "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce." The FDUTPA also prohibits false and misleading advertising.

137.   VPX's unfair and deceptive practices as described herein are likely to mislead – and have misled – consumers acting reasonably in the circumstances.

138.   VPX has violated the FDUTPA by engaging in the unfair and deceptive practices as described herein which offend public policies and are immoral, unethical, unscrupulous and substantially injurious to consumers.

139.   Plaintiffs and consumers in the Florida Classes have been aggrieved by VPX's unfair and deceptive practices and acts of false advertising in that they paid for the BANG products that did not and could not help with "all forms of dementia, including Alzheimer's, Parkinson's,

Huntington's, and other forms of dementia," increase testosterone, or otherwise provide the consumer with a source of creatine, as represented.

140.    In addition, the practice employed by VPX, whereby VPX sold, promoted and marketed BANG with the deceptive representations herein described constitutes a *per se* violation of FDUTPA under § 501.203(3)(c) because it is in violation of the Florida Food Safety Act, § 500.04 (1) and (2), Fla. Stat., in that, said products are misbranded.

141.    VPX's false, unlawful, and misleading product descriptions render its products misbranded under Florida law. Specifically, § 500.04 of the Florida Food Safety Act prohibits the manufacture, sale or delivery of "misbranded food." VPX admits that BANG is a dietary supplement, which meets the definition of "food" under the FFSA. § 500.03(n)(5). Food is "misbranded" when "its labeling is false or misleading in any particular." Fla. Stat. § 500.11(1)(a) & (b). A food is considered mislabeled unless the proper disclosures are made "on the outside container or wrapper" on the product. § 500.03(1)(t). Misbranded products cannot be legally sold and are legally worthless.

142.    The harm suffered by Plaintiffs and consumers in the Florida Classes was directly and proximately caused by the deceptive, misleading and unfair practices of VPX, as more fully described herein.

143.    In addition to seeking recovery of their attorneys' fees and costs pursuant to § 501.2105, Fla. Stat., pursuant to section 501.211(1), Fla. Stat., Plaintiffs and consumers in the Florida Classes seek a declaratory judgment that VPX has violated FDUTPA because its representations are false and/or misleading because, as a matter of body chemistry, BANG cannot help with "all forms of dementia, including Alzheimer's, Parkinson's, Huntington's, and other forms of dementia," increase testosterone, or otherwise provide the consumer with a source of

creatine, as represented. Plaintiffs and consumers in the Florida Classes further seek a declaratory judgment that BANG is a misbranded food under Florida law, and therefore VPX has committed per se violations of FDUTPA

### COUNT III
### UNJUST ENRICHMENT

144.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1–120 as if fully set forth herein.

145.    At all times relevant hereto, VPX designed, manufactured, produced, promoted, marketed and/or sold the BANG products.

146.    Plaintiffs and consumers in the Florida Classes conferred upon VPX non-gratuitous payments for the BANG products. VPX appreciated, accepted or retained the non-gratuitous benefits conferred by Plaintiffs and consumers in the Florida Class, with full knowledge and awareness that, as a result of VPX's deceptive marketing. Plaintiffs and consumers in the Florida Classes were not receiving BANG products of the quality, nature, fitness or value that had been represented by VPX and reasonable consumers would have expected. In fact, the Bang Plaintiffs' purchased was worthless.

147.    VPX profited from its unlawful, unfair, misleading, and deceptive practices and advertising at the expense of Plaintiffs and consumers in the Florida Class, under circumstances in which it would be unjust for VPX to be permitted to retain the benefit. Under common law principles of unjust enrichment, VPX should not be permitted to retain the benefits of this unjust enrichment.

148.    Because VPX's retention of the non-gratuitous benefits conferred by Plaintiffs and consumers in the Florida Classes is unjust and inequitable, Plaintiffs and consumers in the Florida

Classes are entitled to, and hereby seek disgorgement and restitution of VPX's wrongful profits, revenue, and benefits in a manner established by the Court.

## COUNT IV
## BREACH OF EXPRESS WARRANTY

149.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1-120 as if fully set forth herein.

150.    At all times relevant hereto, VPX designed, manufactured, produced, promoted, marketed and/or sold the BANG products.

151.    VPX issued written warranties by listing creatine leading component of "BANG's potent brain & body-rocking" formula.

152.    BANG energy drinks do not conform the such express warranty because such is false and misleading.

153.    Plaintiffs and the Florida Classes were injured as a direct and proximate result of Defendant' BANG's breach because Plaintiffs and the Florida Classes would not have purchased any of the BANG energy drinks if the true facts concerning the safety and efficacy of BANG energy drinks had been known. BANG energy drinks are infective and worthless.

154.    As a result of Defendant VPX's breach, Plaintiffs and the Florida Classes have been damages in the amount of the purchase price of BANG energy drinks.

## COUNT V
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY

155.    Plaintiffs reallege and incorporate by reference the allegations contained in paragraphs 1–120 as if fully set forth herein.

156.    At all times relevant hereto, VPX designed, manufactured, produced, promoted, marketed and/or sold the BANG products. In such capacity, VPX impliedly warranted that BANG

energy drinks were fit for their intended purposes, in that, BANG energy drinks were a safe and effective source of creatine.

157.    Defendant VPX breached the warranty implied in the contract for the sale of the BANG, in that, BANG could not pass without objection in the trade under the contract description, the goods were not of fair average quality within the description, and the goods were unfit for their intended and ordinary purpose because there is no competent and reliable scientific evidence that BANG is a safe and effective source of creatine. As a result, Plaintiffs and the Florida Classes did not receive the goods as impliedly warranted by Defendant VPX to be merchantable.

158.    In reliance upon VPX's skill and judgment and the implied warranties of fitness for the purpose, Plaintiff and the Florida Classes purchased BANG energy drinks for use as a source of creatine.

159.    The BANG energy drinks were not altered by Plaintiff or the Florida Classes. The BANG energy drinks were defective when each left the exclusive control of Defendant VPX.

160.    Defendant VPX knew BANG energy drinks would be purchased and used without additional testing for safety or efficacy by Plaintiffs and the Florida Classes.

161.    BANG energy drinks were defectively designed and unfit for their intended purpose, and Plaintiffs and the Florida Classes did not receive the goods as warranted.

162.    As a direct and proximate cause of Defendant VPX's breach of the implied warranty, Plaintiffs and the Florida Classes have been injured and harmed because they would not have purchased any of the BANG energy drinks if the true facts concerning the safety and efficacy of BANG energy drinks had been known. BANG energy drinks are infective and worthless.

163.    As a result of defendant VPX'S breach, plaintiffs and the Florida classes have been damages in the amount of the purchase price of BANG energy drinks.

## PRAYER FOR RELIEF

164.   Wherefore, Plaintiffs pray for a judgment:

    a.    Certifying the National Class and Florida Class as requested herein;

    b.    Awarding declaratory relief as permitted by law or equity;

    c.    Awarding Plaintiffs and consumers in the Classes damages;

    d.    Awarding restitution and disgorgement of VPX's revenues to Plaintiffs and consumers in the Classes;

    e.    Awarding attorneys' fees and costs; and

    f.    Providing such further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

165.   Plaintiffs, respectfully, demand a jury trial as to all claims so triable.

    dated: June 5, 2020

Respectfully Submitted,

  /s/ *Jibrael S. Hindi*

**JIBRAEL S. HINDI, ESQ.**
Florida Bar No.: 118259
E-mail:    jibrael@jibraellaw.com
**THOMAS J. PATTI, ESQ.**
Florida Bar No.: 118377
E-mail:    tom@jibraellaw.com
The Law Offices of Jibrael S. Hindi
110 SE 6th Street, Suite 1744
Fort Lauderdale, Florida 33301
Phone:    954-907-1136

/s/ *Yechezkel Rodal*

**YECHEZKEL RODAL, ESQ.**
Florida Bar No.  091210
E-mail: Chezky@Rodallaw.com
Rodal Law, P.A.
5300 N.W. 33rd Ave., Ste. 219
Ft. Lauderdale, Florida 33309
Telephone: (954) 367-5308

*COUNSEL FOR PLAINTIFF*